UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

MARCUS C. FREEMAN,

                      Petitioner,

    -vs-

NYS DOCCS,

                      Respondent.

No. 6:19-cv-06633-FPG
DECISION AND ORDER

---

## INTRODUCTION

*Pro se* Petitioner Marcus C. Freeman ("Freeman" or "Petitioner") instituted this habeas corpus action pursuant to 28 U.S.C. § 2254. ECF No. 1. Freeman challenges the constitutionality of the judgment entered against him on December 4, 2014, in New York State, Monroe County Court (Argento, J.) ("Trial Court"), following a jury verdict convicting him of Murder in the Second Degree (N.Y. Penal Law §125.25(1)) and related charges. Freeman is presently incarcerated at Auburn Correctional Facility, serving an aggregate indeterminate sentence of 46 years to life in prison. For the reasons discussed below, the request for a writ of habeas corpus is denied, and the Petition is dismissed.

## BACKGROUND

### I.    Petitioner's Trial

#### A.    The Prosecution's Case

In September of 2013, A.M. testified that she and Freeman were living at 247 Pullman Avenue in Rochester. They had been in a romantic relationship for approximately eight years and had two children together. A.M.'s third child had a different father but lived with them. T.823,

826, 850.[1] In April of that year, Freeman had been criminally charged with "something that had occurred"[2] between him and the minor daughter of Walesy Alvarez ("Alvarez"), who was the girlfriend of A.M.'s brother, Martin Moore ("Moore"). T.824-25. Consequently, A.M. discontinued contact with her brother and Alvarez. The criminal case against Freeman and the resulting family rift caused A.M.'s relationship with Freeman to deteriorate. T.826-27. Nonetheless, A.M. and Freeman were planning on moving the family out to a new residence in Brockport, New York, on Friday, September 6, 2013. T.850, 858, 865, 1037, 1078.

On September 3, 2013, A.M. and Freeman communicated via text message for a couple of hours while A.M. was at work. During their text conversation, A.M. informed Freeman that she no longer wanted to be in a relationship with him. T.829.

A.M. got home from work about 11 p.m., ate dinner, and got into bed with Freeman and their one-year-old daughter. T.829-30. At some point, she was wakened by Freeman touching her vagina. T.830-81. She twice told him to stop because she was tired and needed to wake up early to get her son ready for school. T.831. In addition, their one-year-old daughter was in their bed. T.830, 832.

Freeman stopped touching A.M., got out of bed, and returned to the bedroom with a gun in his hand. T.831-32. Freeman ordered A.M. to disrobe and perform oral sex on him. T.832. If

---

[1] Citations to "T." refer to pages from the trial transcript, filed at ECF Nos. 16-7 through 16-10.

[2] The prosecution moved *in limine* to introduce evidence of a sexual assault charge pending against Freeman at the time of the September 2013 shootings, which involved Alvarez's then twelve-year-old daughter. T.8-9. The Trial Court ruled that the prosecution could elicit the fact that the charge was pending, without going into details about the charge was; and could elicit that the victim of the sexual assault charge was related to Alvarez. T.12. The Trial Court also ruled that Freeman could be asked if he was ordered to submit a DNA sample in connection with that criminal charge. T.12-13. The jury was given a limiting instruction explaining that it could only use the evidence "on the question of the defendant's state of mind and/or for the purpose of explaining the background of the relationship between the individuals involved in this matter." T.1186-87. Freeman did not challenge the Trial Court's evidentiary ruling or limiting instruction on direct appeal. Subsequent to the jury verdict in the instant case, Freeman pleaded guilty to one count of Rape in the Second Degree (N.Y. Penal Law § 130.30(1) (sexual intercourse with a child under 15 years-old)). *See People v. Freeman*, 159 A.D.3d 1337 (4th Dep't 2018).

she did not, Freeman said, he would "shoot [her] eight times." T.832. A.M. complied because Freeman had a gun.

After Freeman left the house early the next morning for work, A.M. gathered up her children, went over to her sister's house, and explained her predicament to her sister and mother. T.836. A.M. started calling friends and family members to help her move out of the house she shared with Freeman. She also rented a moving van and storage unit. T.837-39.

A.M. returned home later that morning with her mother, her sister, and her friends Leonardo Gulino ("Gulino") and Richard Mattice ("Mattice") to pack up her things and load the moving van. T.839-40. About 10:30 a.m., A.M. was inside the house when she heard someone say, "He's here." T.841-42. Moments later, someone said, "He's shootin.'" A.M. heard gunshots outside. T.843.

Meanwhile, Moore and Alvarez had arrived in Alvarez's car and parked in front of the house. T.842, 659-60. Moore got out of the car and spoke briefly to Mattice. Alvarez got out of her car also but then got back in to talk on her phone. Moore lit a cigarette and stood outside Alvarez's car near the driver's side window. T.660.

Freeman drove up in his car, a silver Chrysler 300, and parked next to Alvarez's car. T.556-57, 661-62. Moore watched as Freeman pulled out a "big-ass weapon," looked at him, and started shooting, striking Moore in the chest and neck. T.663-64. The force of the gunshots sent Moore "spinning" around over the hood of Alvarez's car. T.663-65. Moore heard Alvarez say something to Freeman but could not tell what she said. T.664. Moore heard another shot and ran over to Alvarez and saw she was unconscious. T.665.

With Freeman still shooting at him, Moore fled towards the house, passing Mattice and Gulino, who had just come outside. T.665-67. As he ran past Gulino, Moore yelled, "'He's shooting. He's shooting.'" T.515. Gulino recalled that Freeman "looked dead at [him]," pulled his gun out, and was about to shoot him. T.516. Mattice also testified that Freeman looked directly at him and pointed his gun at him. T.557-58. Gulino dove in front of a parked car and saw Freeman trying to cock back the gun. T.516. Mattice heard the gun clicking and saw Freeman trying to unjam it. T.558. Gulino and Mattice took that opportunity to run away from the house. T.518-19, T.557-59.

Meanwhile, as Moore ran to the front porch and up the stairs, Freeman shot him again in the back of his left leg. T.667. Once inside, Moore tried to lock the front and side doors to the house, but Freeman, still shooting, kicked the side door open. T.670. Moore ran upstairs, followed by Freeman, who shot him again in the shoulder area. T.670-71. Moore continued running to the next stair landing and managed to throw a bookshelf down the stairs at Freeman; however, Freeman kept coming after him. T.672. Moore made it to the attic and tried to call 911 but his phone had a bullet hole through it. *Id.*

Freeman did not follow Moore to the attic. Instead, he went to the room where A.M. and her mother were lying down on the floor. T.843-44. A.M. recalled that Freeman, still holding the gun, said to her, "'You're leaving me.'" T.844. A.M. replied, "'No, I'm just moving a few things.'" A.M. and her mother asked Freeman not to hurt A.M., saying that the children needed her. *Id.* Freeman said nothing and walked out of the room, leaving the gun (a modified short-barreled semi-automatic rifle capable of holding 32 rounds of ammunition) on a kitchen counter. T.545, 795-96, 1040.

Mattice, who was hiding behind some bushes across the street, saw Freeman walk "casual[ly]" out of the house holding a knife, get in his car, and drive away. T.519-20, 561-62. Mattice ran back to 247 Pullman Avenue to Alvarez's car to check on her, as he had heard Moore yell that Freeman had shot his wife. T.562. Gulino also went to check on Alvarez. T.522. Mattice and Gulino saw blood and brain matter coming out of the back of her head. T.523, 562-63. Mattice grabbed the back of her head; Gulino removed his shirt and used it to compress the skull wound. T.523, 563. They stayed with Alvarez until the paramedics arrived. *Id.*

Alvarez died later that day as a result of the gunshot wound to her head. T.674, 1017-19. Moore sustained damaged arteries in his neck, a fractured rib, and a fractured shoulder bone, for which he underwent multiple surgeries. T.674-75. At the time of trial, he had reduced functioning in his leg and shoulder and six bullet fragments lodged near his heart. *Id.*

On September 5, 2013, after receiving a tip that Freeman might be located at 48 Second Street, Rochester Police Department ("RPD") officers surrounded the house at that address and asked that any occupants exit through the front door with their hands up. T.982-83. A woman, Felicita Lugo ("Lugo") surrendered first. About ten minutes later, Freeman came outside and was placed under arrest by members of the SWAT team. T.984-85, 987-90.

### B.    The Defense Case

Freeman testified that he was arrested in March of 2013, for the incident involving Alvarez's daughter, T.P., and prohibited from having any direct or third-party contact with her. T.1033. After the arrest, Freeman and A.M. moved from Westmount Street to Pullman Avenue because they were receiving threats from the Moore/Alvarez family. T.1034. In February 2013, Freeman purchased the gun used in the September 4, 2013 shootings for self-protection. It was

Moore who sold him the gun. T.1037. Freeman admitted he knew he was not allowed to own a gun because he had a felony conviction. T.1066. In May of 2013, T.P.'s father and uncle approached Freeman in his driveway and shot him in the forearm and the groin/hip area. T.1034-36.

When he arrived home on September 4, 2013, to have lunch with his family, Freeman saw several vehicles belonging to the Moore/Alvarez family. As he approached, he saw Moore "coming around the vehicle with something in his hand," but he was "not clear of what it was yet." T.1040. Freeman described Moore as coming towards him in "an aggressive manner." *Id.* Freeman then "opened fire on" Moore. *Id.* When Moore ran towards Freeman's house, Freeman pursued him and continued to shoot because he thought members of his (Freeman's) family were inside the house. *Id.* Freeman ran inside the house; when he got to the top of the stairs, he did not see Moore anywhere. T.1040. He saw A.M., her mother, and her sister, and asked what was going on and why all these people were here. *Id.* A.M.'s sister told him that she called the police, that he should "get out of here," and they would "tell [him] later" what was going on. *Id.* Freeman went downstairs, placed his gun on a kitchen counter, and left the house. *Id.* Freeman denied attempting to fire the gun at Gulino or Mattice.

Freeman denied having any sexual contact with A.M. on September 3, 2013. T.1038. He also denied threatening her with a gun. *Id.*

## II.    The Verdict and Sentencing Hearing

The jury returned a verdict convicting Freeman of Count One (second-degree murder of Alvarez); Count Two (attempted second-degree murder of Moore); Count Three (first-degree assault of Moore); Count Six (first-degree criminal use of a firearm against Alvarez); Count Seven

(first-degree criminal sexual act against A.M.); and Count Eight (first-degree criminal use of a firearm against A.M.). Freeman was acquitted of Counts Four and Five, both of which charged attempted first-degree assault against Mattice and Gulino, respectively. *See* T.1276-79; SR. 33-36.[3]

On December 4, 2014, the Trial Court sentenced Freeman as a second violent felony offender to an indeterminate term of 25 years to life in prison on Count One and determinate terms of 25 years' imprisonment on Counts Two, Three, Six, Seven, and Eight. *See* S.13-18.[4] All the determinate sentences included a five-year term of post-release supervision. The Trial Court ordered the sentences on Counts One, Two, and Seven to run consecutively, and further ordered that five years of the sentence on Count Six, which related to Count Two, must run consecutively to Count Two. Finally, the remaining sentences were ordered to run concurrently. S.13-15.

## III.     Direct Appeal

Represented by new counsel, Freeman pursued a direct appeal of his conviction to the Appellate Division, Fourth Department, of New York State Supreme Court ("Appellate Division"). Appellate counsel argued that the trial court's denial of a justification charge on Count Two, the attempted second-degree murder charge, constituted reversible error; and that the first-degree criminal sexual act charge and the related firearms-use charge were against the weight of the evidence.

The Appellate Division unanimously vacated the convictions on Counts Two, Three, and Six, relating to Moore's shooting, and affirmed the judgment as modified. *People v. Freeman*, 159 A.D.3d 1334 (4th Dep't), *lv. denied*, 31 N.Y.3d 1147 (2018). The Appellate Division held that the

---

[3] Citations to "SR." refer to the Bates-stamped pages of the State Court Records, filed at ECF No. 16-1.
[4] Citations to "S." refer to pages from the transcript of the sentencing proceeding, filed at ECF No 16-6.

Trial Court had committed reversible error by declining to grant the defense request for a justification charge on the vacated counts. While characterizing the justification claim as "dubious," the Appellate Division determined that, viewing the record in the light most favorable to the defense, "it would not have been irrational" for the jury to credit Freeman's testimony that he shot Moore in self-defense after Moore approached him in an aggressive manner while holding something in his hand. *Id.* at 1335. The Appellate Division rejected Freeman's other contentions, including that he was entitled to a justification charge as to the second-degree murder count involving Alvarez. *Id.* at 1336.

## IV.    The Federal Habeas Petition

Freeman commenced this habeas proceeding by filing his Petition on July 11, 2019, raising the two arguments he asserted on direct appeal as grounds for habeas relief. *See* Petition ("Pet.") at 6, 8 (ECF No. 1). Respondent filed a Response (ECF No. 13) to the Petition, along with a Memorandum of Law ("Resp't Mem.") (ECF N. 12) and the relevant state court records. *See* ECF Nos. 14, 15 & 16-1 through 16-10. Freeman did not file reply papers.

## DISCUSSION

## I.    Personal Jurisdiction

Before discussing the merits, the Court must address a jurisdictional issue concerning the proper defendant. *See Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 48 (2d Cir. 2012) (stating that the court has "an independent obligation to determine whether federal jurisdiction exists").

"Ordinarily, a petition for a writ of habeas corpus must be brought against the petitioner's *custodian*, for that is the party to whom the writ would be directed." *Scherl v. U.S. Parole Comm'n*, No. 92 CIV. 7435 (PNL), 1993 WL 258736, at *2 (S.D.N.Y. July 7, 1993). Thus, "[i]n order for

a court to entertain a habeas corpus action, it must have jurisdiction over the petitioner's custodian." *Billiteri*, 541 F.2d at 948. The "[f]ailure to name the petitioner's custodian as a respondent deprives federal courts of personal jurisdiction." *Stanley v. Cal. Sup. Ct.*, 21 F.3d 359, 360 (9th Cir. 1994) (citations omitted); *see also Billiteri*, 541 F.2d at 948 (dismissing habeas petition for lack of jurisdiction because warden of federal penitentiary, who was petitioner's custodian throughout the district court litigation, was never named as a respondent in the proceedings).

As the caption of this case indicates, Freeman named as the respondent, "NYS DOCCS," *i.e.*, the New York State Department of Corrections and Community Supervision, and not the superintendent of the correctional facility having custody of him. Thus, Freeman's Petition is subject to dismissal for lack of personal jurisdiction. *See Billiteri*, 541 F.2d at 948.

"[I]t is well-recognized," however, "that personal jurisdiction—unlike subject-matter jurisdiction—may be waived." *Smith v. Idaho*, 392 F.3d 350, 355 (9th Cir. 2004). The Second Circuit and its sister circuits have applied this general rule in the context of habeas petitions. *See, e.g.*, *Simon v. United States*, 359 F.3d 139, 143 n.9 (2d Cir. 2004); *see also Smith*, 392 F.3d at 356; *Moore v. Olson*, 368 F.3d 757, 759 (7th Cir. 2004). In a § 2254 habeas petition, the petitioner's immediate custodian is named as a respondent "in his or her official capacity, as the state official legally responsible for the petitioner's continued detention." *Smith*, 392 F.3d at 355. "Because the custodian is the state's agent—and the state is therefore the custodian's principal—the state may waive the lack of personal jurisdiction on the custodian's behalf." *Id.*

Here, the New York State Attorney General's Office ("A.G.'s Office") appeared in this action and filed an answer to the Petition, stating it was appearing on behalf of the named respondent, NYS DOCCS. *See* Response ¶ 2 (ECF No. 13). The A.G.'s Office did not raise the

affirmative defense of lack of personal jurisdiction; instead, it asserted only substantive legal defenses to the Petition's claims. The "personal jurisdiction defense is forfeited if not raised by motion to dismiss or asserted in the [a]nswer." *Perez v. Sandals Resorts Int'l, Ltd.*, No. 11 CV 914 RML, 2015 WL 94223, at *5 (E.D.N.Y. Jan. 7, 2015) (citing Fed. R. Civ. P. 12(h)). Accordingly, the Court finds that the A.G.'s Office has waived the defense of personal jurisdiction on behalf of its agent, the superintendent of the correctional facility where Freeman is housed. *See id.*; *Smith*, 392 F.3d at 355-56.

The Court notes that this result is "consistent" with the principle that "'[p]rompt resolution of prisoners' claims is a principal function of habeas.'" Smith, 392 F.3d at 556 (quoting *Ortiz–Sandoval*, 81 F.3d at 896). It would be a waste of both judicial and the parties' resources for the Court to dismiss the Petition without prejudice to allow Freeman to amend the Petition to add the proper respondent. *See id.*

Having determined that it has personal jurisdiction, the Court proceeds to evaluate the merits of the Petition.

## II. Ground One: Failure to Give a Justification Instruction on the Murder Charge

### A. Overview

Freeman argues that a jury charge on the defense of justification should have been given "as to all four counts. (Counts 1, 2, 3 and 6)." Pet. ¶ 12(a) (ECF No. 1, p. 5 of 16). Freeman asserts that the "confrontation was part of one, unbroken, continous [sic] chain of events," and "it is simply not possible to parse each element of conduct into separate, discreet [sic] acts." *Id.* In addition, Freeman claims, he was not aware of Alvarez's presence and thus could not have had any intent to commit murder in the second degree. *Id.*

As an initial matter, the Court concludes that Freeman's first ground for relief, insofar as it pertains to Counts 2, 3, and 6, is moot. The Appellate Division agreed that the Trial Court erred in refusing to instruct the jury on the defense of justification on these counts. Accordingly, the Appellate Division vacated the convictions on Counts 2, 3, and 6, and provided Freeman with the relief he is seeking here. Thus, the only conviction at issue in Ground One of the Petition is Count 1, the second-degree murder charge involving Alvarez, which the Appellate Division declined to vacate.

Respondent argues that the Appellate Division adjudicated the justification claim on the merits and, as such, it is subject to the limitations on relief set forth in 28 U.S.C. § 2254(d) ("Section 2254(d)"). Respondent contends that Freeman was not entitled to a justification charge as a matter of New York State law and, consequently, the Court need not consider whether the denial of the charge violated his due process rights or was an unreasonable application of clearly established Supreme Court law. *See* Resp't Mem. at 16-20 (ECF No. 12). In any event, Respondent argues, Freeman cannot be granted habeas relief because he has not identified any Supreme Court holding that clearly establishes entitlement to a justification charge under the factual circumstances presented here. *Id.* at 20.

### B. Section 2254(d)'s Limitations on Relief

Section 2254(d) sets forth several limitations on habeas relief. *See Jimenez v. Walker*, 458 F.3d 130, 135 n. 2 (2d Cir. 2006). Under that section, a writ of habeas corpus on behalf of a state prisoner may not be granted as to a claim that was "adjudicated on the merits in State court proceedings unless the adjudication of the claim -- (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable

determination of the facts in the light of the evidence presented in the State court proceeding." 28 U.S.C. § 2244(d). To obtain a writ of habeas corpus under § 2254(d)(1), the state court decision must be "either 'contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States,' or 'involve[ ] an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States.'" *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000) (emphasis omitted in original; quotation omitted). The phrase "clearly established Federal law" means "the holdings, as opposed to the *dicta*, of [Supreme Court] decisions as of the time of the relevant state-court decision." *Id.* at 365.

Courts have interpreted the phrase "adjudicated on the merits" as meaning that a state court "(1) dispose[d] of the claim 'on the merits,' and (2) reduce[d] its disposition to judgment." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001). In determining whether a claim was adjudicated on the merits, courts examine the "last reasoned decision" issued by the state courts. *Ylst v. Nunnemaker,* 501 U.S. 797, 803 (1991) (explaining the long-standing presumption that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground"); *see also id.* at 804 (noting that "courts generally affirm[ ] without further discussion when they agree, not when they disagree, with the reasons given below").

### C. The State Courts' Rulings

The Trial Court did not give any explanation when it denied Freeman's request for a jury charge on justification, simply stating, "The Court is going to decline to read that charge." T.1133.

On direct appeal, the Appellate Division "reject[ed] [Freeman]'s contention . . . that the court should have charged the jury on the defense of justification with respect to count one,

charging murder in the second degree. The justification defense does not apply to the intentional murder of Alvarez, who was shot while sitting in Moore's vehicle and posed no conceivable threat to defendant." *Freeman*, 159 A.D.3d at 1336.

The New York Court of Appeals summarily denied leave to appeal from the Appellate Division's decision. *See Freeman*, 31 N.Y. 3d at 1147 (stating that leave was "denied").

Here, the last reasoned state court decision was the Appellate Division's decision affirming the judgment as modified. The Appellate Division clearly disposed of the justification claim regarding the murder conviction on the merits and reduced its decision to judgment. The Appellate Division's decision therefore adjudicated the justification claim on the merits for purposes of Section 2254(d).

### D. Availability of Habeas Relief for Denial of a Justification Instruction

The Supreme Court has explained that a state court's failure to give a requested jury instruction does not raise a federal constitutional question unless the absence of the instruction "'by itself so infected the entire trial that the resulting conviction violates due process.'" *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). Federal courts "must . . . defer to state-court interpretations of the state's laws, so long as those interpretations are themselves constitutional" when deciding whether the evidence requires the issuance of a jury instruction under state law. *Davis v. Strack*, 270 F.3d 111, 123 n.4 (2d Cir. 2001).

The Second Circuit has identified three relevant questions that must be answered affirmatively before a federal court may grant a writ of habeas corpus based on a state court's refusal to give a jury charge requested by the defense:

> First, was the justification charge required as a matter of New York state law? Second, if so, did the failure to give the requested charge violate the standard set

out in *Cupp*. Third, if so, was the state court's failure of such a nature that it is remediable by habeas corpus, given the limitations prescribed by 28 U.S.C. § 2254?

*Davis*, 270 F.3d at 124.

In *Davis*, the Second Circuit held that the "unreasonable application" clause of Section 2254(d) covered a situation where, "on the basis of the evidence presented, [the petitioner] had a clear right under New York law to have the jury consider his defense, and the trial in which he was denied that right was egregiously at odds with the standards of due process propounded by the Supreme Court in *Cupp*." 270 F.3d at 133. The Second Circuit also found that the case fit within "subsection (2) of § 2254(d) in that it resulted in a 'decision that was based on an unreasonable determination of the facts in the light of the evidence.'" *Id.* (quoting 28 U.S.C. § 2254(d)(2)).

The habeas court, however, need only reach the question of whether Section 2254(d)'s limitations on relief apply if it answers the first two *Davis* questions in the petitioner's favor. *See Blazic v. Henderson*, 900 F.2d 534, 543 (2d Cir. 1990).

### E.  A Justification Charge Was Not Required Under New York Law

N.Y. Penal Law § 35.15 sets out the defense of justification for the use of deadly and non-deadly physical force:

> 1. A person may, subject to the provisions of subdivision two, use physical force upon another person when and to the extent he reasonably believes such to be necessary to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by such other person. . . .

> 2. A person may not use deadly physical force upon another person under circumstances specified in subdivision one unless:

> (a) He reasonably believes that such other person is using or about to use deadly physical force. Even in such case, however, the actor may not use deadly physical force if he knows that he can with complete safety as to himself and others avoid the necessity of so doing by retreating . . . .

N.Y. Penal Law § 35.15.

"[A] charge on justification is warranted whenever there is evidence to support it." *People v. McManus*, 67 N.Y.2d 541, 549 (1986). "[I]f on any reasonable view of the evidence, the fact finder might have decided that the defendant's actions were justified . . . the trial court should instruct the jury as to the defense and must when so requested." *People v. Padgett*, 60 N.Y.2d 142, 144-45 (1983).

"[I]n determining whether the evidence warrants a justification charge, the court must assess the record in the light most favorable to the defendant." *Davis*, 270 F.3d at 124-25 (citing *McManus*, 67 N.Y.2d at 549; *Padgett*, 60 N.Y.2d at 144-45 (noting that even where an aspect of defendant's testimony was inconsistent with justification defense, charge should have been given); other citations omitted)). In other words, "if the record includes evidence which, viewed in the light most favorable to the defendant and drawing all reasonably permissible inferences in his favor, satisfies the essential elements of the defense of justification, the charge must be given." *Davis*, 270 F.3d at 125.

The Second Circuit has interpreted N.Y. Penal Law § 35.15 and "the leading New York cases construing it," *Davis*, 270 F.3d at 125 (citations omitted), as establishing the following essential elements of the defense:

> I. If the defendant reasonably believes
>
> (a) that another person is using or is about to use deadly physical force against him, and
>
> (b) that it is necessary for him to use deadly physical force to defend himself, then the defendant is justified in using deadly physical force against the other person, but only to the extent he reasonably believes necessary to defend himself; provided the defendant did not have a duty to retreat instead of using deadly physical force in his defense.

*Id.* (footnote omitted). "In order to be entitled to a justification instruction, a defendant must show both that he subjectively believed that deadly force was necessary under the circumstances and

that a reasonable person in his situation would have held this belief." *Blazic v. Henderson*, 900 F.2d 534, 540 (2d Cir. 1990) (citing *People v. Goetz*, 68 N.Y.2d 96, 115 (1986)). Because justification is a defense rather than an affirmative defense, the prosecution "bear[s] the burden of disproving it beyond a reasonable doubt." *Davis*, 270 F.3d at 124.

Here, the Appellate Division held that "[t]he justification defense does not apply to the intentional murder of Alvarez, who was shot while sitting in Moore's vehicle and posed no conceivable threat to defendant." *Freeman*, 159 A.D.3d at 1336. The Appellate Division reasoned that if the jury had believed Freeman's testimony that "he shot at Moore in self-defense and that he did not even know that Alvarez had been shot[,] . . . it would have acquitted him of intentional murder inasmuch as he testified that he did not intend to kill Alvarez." *Id.* However, "[b]ecause the jury convicted [Freeman] of murder in the second degree, [the Appellate Division] must presume that it followed the [Trial] [C]ourt's instructions and concluded that [Freeman] intended to kill Alvarez. Of course, if [Freeman] intended to kill Alvarez, then he was not justified in doing so inasmuch as she posed no threat to him." *Id.*

The Court finds that the Appellate Division correctly concluded that Alvarez posed "no conceivable threat" to Freeman. Freeman, 159 A.D.3d at 1336. Viewing the evidence, and the inferences to be drawn from that evidence, in the light most favorable to Freeman, there is no reasonable view of the proof that supports either the subjective or objective element of a justification defense. Freeman testified that he did not even know that Alvarez was sitting in the vehicle. Thus, he could not have subjectively believed that deadly force was necessary to defend himself against her under the circumstances. Nor could he have objectively believed that a reasonable person in his situation would have felt that deadly force was necessary. Stated another way, if Freeman did not know Alvarez was there, he could not reasonably have believed that she

was using or was about to use deadly physical force against him, or that it was necessary for him to use deadly physical force to defend himself against her. Thus, Freeman's own testimony, if believed, did not establish either element of a justification charge. Rather, as the Appellate Division found, it would negate the *mens rea* element of the underlying crime—that Freeman lacked the intent to kill Alvarez. But, by reaching a guilty verdict on the second-degree murder count, the jury necessarily found that Freeman was aware of Alvarez's presence and intentionally shot her with the intent to kill.

Freeman also argues that the Appellate Division was wrong to "parse" the shootings of Alvarez and Moore into separate and discrete acts because the incidents were part of an unbroken, continuous chain of events. *See* Pet. ¶ 12(a) at 6. Freeman thus suggests that if he was justified in shooting Moore, then he necessarily was justified in shooting Alvarez. The Appellate Division apparently construed Freeman's argument in this manner but also rejected it, noting that the Trial Court did not instruct the jury on transferred intent.

"The transferred intent theory, codified under [N.Y.] Penal Law § 125.25(1), provides that 'where the resulting death is of a third person who was not the defendant's intended victim, the defendant may nonetheless be held to the same level of criminal liability as if the intended victim were killed[.]'" *People v. Dubarry*, 25 N.Y.3d 161, 171 (2015) (quoting *People v. Fernandez*, 88 N.Y.2d 777, 781 (1996)). "The theory is deployed in order to permit a jury to find defendant guilty of intentional murder, even though technically lacking an intentional state of mind with respect to the actual victim[.]" *Id.* (citing *Fernandez*, 88 N.Y.2d at 781).

Freeman has not cited, and this Court has not found, any authority for the proposition that the doctrine of transferred intent applies in the context of a justification defense. In fact, the caselaw suggests the opposite—that transferred intent it is not available to a defendant asserting

self-defense. In *Vassell v. McGinnis*, No. 04-CV-0856(JG), 2004 WL 3088666, at *9 (E.D.N.Y. Dec. 22, 2004), the district court considered the propriety of a jury instruction that stated in part as follows:

> [W]ith respect to the justification charge, I don't know if I was clear on this. As to each of the counts, the charges, you have to first find that the People have proved beyond a reasonable doubt the guilt of the defendant before you can apply justification. I think you understand that. But when you do it, it is not a blanket type of thing. You can't say he was justified and then blanketly find him not guilty. You have to do it individually as to each count. In other words, it is possible that a person could be justified as to one count and not justified as to another. Or it could be justified as to all or justified as to none. But you must do it separately as to each count.

*Id.* The district court rejected the habeas petitioner's contention that this instruction was erroneous, concluding that he had failed to marshal any authority. *Id.* Moreover, the district court determined, the challenged instruction was "clearly an accurate statement of the law" since "New York's model instruction for defensive use of deadly physical force is constructed around justification for a *particular crime*." *Id.* (emphasis added).

Here, the prosecution's theory of the case, as set forth in the indictment and as argued at trial, was that Freeman intentionally shot and killed Alvarez and independently shot at Moore with intent to kill him. *See* Indictment, SR.33; *Freeman*, 159 A.D.3d at 1336. On the record in this case, there was no basis to consider the question of justification for both Alvarez and Moore jointly. *See People v. Davis*, 169 A.D.2d 774, 775 (2d Dep't 1991) (no evidence to support defense of justification as to shooting of second victim where first victim grabbed a tree branch and hit the defendant from behind, after which defendant turned around, pulled out a gun and shot him; second victim, who was unarmed, ran towards defendant screaming, "that's my brother"; defendant shot second victim twice as he ran towards defendant).

"[D]ue process does not require the giving of a jury instruction when such charge is not supported by the evidence." *Blazic*, 900 F.2d at 541. As a matter of New York law, the evidence at trial, viewed in the light most favorable to Freeman, did not support a justification charge with regard to the intentional murder of Alvarez. Therefore, the Trial Court's failure to give the requested justification charge did not violate Freeman's right to due process. *See id.*

Because the Court has answered the first two *Davis* questions unfavorably to Freeman, it need not analyze the remaining question in the *Davis* analysis, *i.e.*, whether the Appellate Division's decision unreasonably applied, or was contrary to clearly established Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented. *See Blazic*, 900 F.2d at 543.

## III.    Ground Two: Verdicts Against the Weight of the Evidence

Freeman argues, as he did on direct appeal, that the jury verdicts on the count charging first-degree sexual abuse and the related count charging use of a firearm were against the weight of the evidence. *See* Pet. ¶ 12(a) at 7 (stating that he was "convicted soley [sic] on alleged victims [sic] false testimony). On direct appeal, Freeman characterized the only evidence of the sexual assault—A.M.'s testimony—as not credible because she did not call the police or go to the hospital, despite claiming that Freeman's behavior scared her. The Appellate Division rejected this argument, finding that A.M.'s testimony concerning the assault was "not incredible as a matter of law," and that Freeman's "denial of the assault presented the jury with a credibility determination." *Freeman*, 159 A.D.3d at 1336. According to the Appellate Division, the jury's credibility determination was reasonable given that A.M.'s testimony "was corroborated by the fact that the morning after the assault she secreted her children away and attempted to move out of the residence she had shared with [Freeman]." *Id.* "Viewing the evidence in light of the elements of the crimes

in counts seven and eight as charged to the jury," *id.* at 1336-37 (citation omitted), the Appellate Division concluded that the verdict was not against the weight of the evidence with respect to those counts. *Id.* at 1337 (citing *Bleakley*, 69 N.Y.2d at 495).

The "weight of the evidence" claim asserted by Freeman derives from New York Criminal Procedure Law ("C.P.L.") § 470.15(5), which permits an appellate court in New York to reverse or modify a conviction where it determines "that a verdict of conviction resulting in a judgment was, in whole or in part, against the weight of the evidence." N.Y. Crim. Proc. Law § 470.15(5). "A 'weight of the evidence' argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5), whereas a legal sufficiency claim is based on federal due process principles." *Correa v. Duncan*, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001).

It is well settled that "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (citations and footnote omitted). Thus, "federal habeas corpus relief does not lie for errors of state law[.]" *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (citations omitted). Since a "weight of the evidence" claim is purely a matter of state law, federal courts routinely dismiss such claims as failing to raise a federal constitutional issue cognizable in a habeas proceeding. *See*, *e.g.*, *Ex parte Craig*, 282 F. 138, 148 (2d Cir. 1922) (holding that "a writ of habeas corpus cannot be used to review the weight of evidence"); *Garrett v. Perlman*, 438 F. Supp. 2d 467, 470 (S.D.N.Y. 2006) (same); *Douglas v. Portuondo*, 232 F. Supp.2d 106, 116 (S.D.N.Y. 2002) (same); *see also Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996). The "weight of the evidence" claim accordingly must be dismissed as not cognizable in this Section 2254 proceeding.

## CONCLUSION

For the reasons discussed above, the request for a writ of habeas corpus is **DENIED** and the Petition (ECF No. 1) is **DISMISSED**. Because Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability is **DENIED**. The Clerk of Court is directed to close this case.

SO ORDERED.

_____
HON. FRANK P. GERACI, Jr.
United States District Judge

Dated: March  23, 2020
       Rochester, New York.